HOOVER et al. v. ECKERD'S CUT RATE MEDICINE CO., Inc.

No. 696.

District Court, D. Delaware.

Oct. 21, 1931.

Charles F. Curley, of Wilmington, Del., and Clifford E. Dunn and David A. Woodcock, both of New York City, for plaintiffs.

Robert Starr Allyn, of New York City, and Henry R. Isaacs, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a suit in equity brought by Fred R. Hoover, as owner of the legal title to United States letters patent Nos. 1,222,144, and 1,225,362, granted to William M. Ruthrauff April 10, 1917, and May 8, 1917, respectively, upon applications filed October 2, 1916, against Eckerd's Cut Rate Medicine Company, Inc. Each patent is for a dentifrice. Pursuant to stipulation between the parties, an order was entered making W. M. Ruthrauff Company, a party plaintiff. It is the manufacturer and licensee under these patents of a tooth paste sold under the trade-name of "Acident." The bill contains the usual prayers for an injunction and an accounting of profits and damages.

The defendant attacks plaintiffs' title, contends that there is no patentable invention involved in either patent, that the patentee abandoned any invention which he might have had, and that, even if the patents are valid, defendant has not infringed either of them.

The principal constituent of the enamel of the teeth is tricalcium or tribasic calcium phosphate. It is soluble in hydrochloric, acetic, or lactic acid in the sense that it will combine with them to form monobasic and dibasic calcium phosphate, both of which are soluble calcium salts, acid in character. Monobasic and dibasic calcium phosphates, when neutralized by an alkali, precipitate tribasic calcium phosphate.

There is evidence that nature hardens teeth through the action of saliva, and that calcium salts are abstracted from the blood stream and secreted by the three glands of the mouth into the saliva. Saliva is sometimes alkaline and sometimes acid; the change occurring several times a day.

It was the aim and object of the patentee to calcify the teeth by imitating or supplementing what he assumed to be nature's process.

Patent No. 1,222,144, the first in suit, relates particularly to an acid calcifying

216

dentifrice. It contains seven claims, of which claims 1 and 2 are in issue. They read:

"1. A calcifying dentifrice comprising a soluble calcium salt adapted to permeate the minute spaces in the tooth surface and be there transformed and deposited by the saliva in the form of the natural cementing substance of the tooth, in combination with an agent for more effectively causing the solution to permeate and completely fill up such spaces.

"2. A calcifying dentifrice containing the calcium salts of which the teeth are composed, held in solution by an acid, so as to be converted by the saliva into the natural cementing substance of the tooth and deposited in the external spaces of the tooth, sealing up these spaces and thereby causing a calcification or solidification of the tooth's surface; and an agent possessing hygroscopic action by which the calcifying solution may be more effectively introduced into the external enamel spaces of the tooth, by virtue of the affinity of said hygroscopic vehicle for the residual moisture of the tooth's structure; and an abrasive which will not chemically interfere with said calcifying action."

The second patent in suit, No. 1,225,362, like the first, relates to an acid calcifying dentifrice. Both patents were applied for on the same day. The second patent contains five claims, all of which are in suit. It is sufficient to quote claim 1, which reads:

"1. A dentifrice comprising an acid salt inert to the tribasic calcium phosphate of the tooth structure, and capable of stimulating secretion of alkaline saliva and of reacting therewith to deposit tribasic calcium phosphate in the interstices of the tooth surface."

The plaintiffs contend that the essence of the invention of the two patents in suit it to provide a tooth paste that will calcify the teeth; the "gist of the invention is to provide a calcifying dentifrice."

There is some scientific opinion in support of the theory that the enamel of the teeth is porous. It is admitted, however, that the spaces, if spaces there be, are infinitesimally small and are close to the limit of visibility under the microscope. It is significant that plaintiffs' expert and the patentee entertain different theories as to the spaces or interstices in the teeth. The expert testified: "Here you have got little columns, rods, apparently there, with a little space in between the rods, as if you had a handful of lead pencils here and there is a little space in between, and I should say that the space, judging from the appearance of the microscope, seems to be pretty close to the limit of visibility, which is about 1/200th of a hair diameter." On the other hand, the patentee testified: "These tubules are interlaced with small fibres, so that there are practically no spaces between the tubules. They are primarily a solid mass and what were formerly recognized as canals and interstices in the enamel are now considered to be largely the spaces inside the tubes." It thus appears that the nature or extent of the porosity of the teeth, the existence of which is necessary to support plaintiffs' theory of artificial calcification of the teeth, is in the realm of debatable theory.

To substantiate plaintiffs' theory of artificial calcification, they rely on the testimony of a chemical expert. This expert conducted certain so-called "weighing" tests. He testified that he took recently extracted teeth, cleaned them, had the roots cut off and as much as possible of the dentine hollowed out, so that enamel remained for the tests. These enamel crowns were then separately washed, dried, and weighed and placed in vials which contained one-half gram of tooth paste, 2 c. c. of water, and 1 c. c. of saliva. Once each day fresh saliva was added and the vials shaken up, until the eighth day, when the crowns were removed from the vials, washed and put into a fresh mixture of tooth paste and saliva. The daily addition of saliva continued until the thirteenth day, when the crowns were removed, washed, and dried as before. The same procedure was followed until the twenty-fifth day, when a third and final weighing took place. The results of the weighing showed that each of the four crowns treated in the experiment gained appreciably in weight. From these tests the expert drew the conclusion that the increase in weight could be attributed only to the deposit of tricalcium phosphate in the interstices of the teeth. He also testified to a series of tests made by him designated "staining tests." These were likewise made with sections of recently extracted teeth. From the results reached, he drew the conclusion that the changes in appearance of the teeth following his treatment could be due only to the absorption by the teeth of something that was formerly in the tooth paste, and

that that "something" must have been tricalcium phosphate.

Defendant's expert denies that these tests demonstrate artificial calcification. He testified: "I do not consider those tests, as carried out, fair at all, or representative of what happens in the mouth. They were made under conditions such as can never obtain in the mouth. In the first place, let me say that these tests were made on dead teeth, and it is admitted that there may be metabolic changes in the teeth, so that there must be some difference in the teeth when they are dead and out, and the teeth when they are still in our gums connected with the nerve; * * * He added saliva in his weighing experiments from time to time and in that fashion, of course, obtained the reaction which was in no wise representative of any reaction in the mouth. So I would say these tests are in no way comparable to anything that takes place in the mouth, and are of no value to determine whether there is any calcifying action or not."

I accept the opinion of defendant's expert. I reject the opinion of plaintiffs' expert as to artificial calcification. No literature of the art recognizing the soundness of the calcification theory of the patents in suit was produced, nor is there evidence to show a general recognition of such theory by the public. A calcifying dentifrice that will not calcify is of no use. It is inoperable and therefore not useful.

Stripped of their calcifying characteristics, can the patents in suit be sustained? Do they disclose and claim more than an acid dentifrice such as disclosed in an earlier patent to the same patentee? I think not.

Patent No. 1,133,250 was issued March 23, 1915, to Ruthrauff (referred to as the Pepsodent patent) for an improved dentifrice. The specification of this patent states: "The prime purpose of my invention is to dissolve the mucin film [harboring bacteria] as it collects upon the tooth before any harm can be done." For this purpose the patentee sets forth a formula for manufacturing a compound made up of tricalcium phosphate, hydrochloric acid, and pepsin, together with other ingredients not necessary to his invention. As to the use of pepsin, the specification states: "I may also substitute, within the scope of my invention, for the pepsin mentioned in the foregoing formula, other digestive ferments for the purpose of dissolving the protein deposit on the tooth, and in the accompanying claims I use the word 'proteolytic enzyme' as covering generically such substances." It is admitted that this patent is for a proteolytic acid dentifrice.

In the first patent in suit, No. 1,222,144, Ruthrauff, in his specification, states: "This invention relates to a dentifrice and particularly to a dentifrice adapted to build up tooth structure, in addition to performing cleaning, polishing and preservative functions, and to directly counteract as well as prevent the processes generally known as dental caries or tooth decay." The material ingredients of the dentifrice of this patent are tricalcium phosphate, hydrochloric acid, and a proteolytic enzyme, which may be pepsin, and glycerin. But the use of glycerin had been common in tooth pastes for many years prior to the filing of any of the Ruthrauff patent applications. Standard Formulary, 1901; the Quantitative Analysis of Medicinal Preparations, by Fuller, 1912; Clark United States patent, No. 396,192; Lidgey British patent, No. 3034 of 1914. Aside from the theory of artificial calcification, this patent discloses nothing more than a proteolytic acid dentifrice like that of the Pepsodent patent.

In the second patent in suit, No. 1,225,362, the specification, like the specification in the Pepsodent patent and the first patent in suit, states that the invention "relates to improvements in a dentifrice and particularly to a dentifrice which in addition to performing cleaning and polishing functions, actively counteracts dental caries." I find nothing in this patent not fully disclosed in the Pepsodent patent except the patentee's theory of calcification of the tooth.

Every patentable invention must be "new and useful." The patents in suit lack novelty and utility and fail to meet the requirements of the Constitution and of the statutes relating to patents. Troy Laundry Machinery Co. v. Columbia Mfg. Co. (D. C.) 217 F. 787; Besser v. Merrilat Culvert Core Co., 243 F. 611 (C. C. A. 8); General Electric Co. v. De Forest Radio Co., 44 F.(2d) 931, 934 (C. C. A. 3).

I conclude that there is no patentable invention involved in the patents in suit, and that they are therefore invalid.

The bill of complaint must be dismissed.